Estate of Grant H. Piggott, Deceased, David S. Piggott and Albert F. Piggott, Co-Administrators v. Commissioner.
Estate of Piggott v. Comm'r
Docket No. 88416. United States Tax Court
T.C. Memo 1963-61; 1963 Tax Ct. Memo LEXIS 282; 22 T.C.M. (CCH) 241; T.C.M. (RIA) 63061; March 1, 1963
John L. King, Esq., for the petitioners. Julian R. Ettelson, Esq., and Carl W. Kloepfer, Esq., for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: Respondent has determined a deficiency in the estate tax of petitioners in the amount of $15,025.58. The issue here presented is whether the proceeds of a life insurance policy insuring the life of decedent wherein The J. T. Wing Company was the designated beneficiary and which corporation received such proceeds or upon whose debt a portion thereof was applied are includable in the taxable estate of petitioners. Another issue raised by the pleadings has been conceded by petitioners. Findings of Fact The facts which have been stipulated are incorporated herein by *283 reference. Petitioners, David S. Piggott and Albert F. Piggott, are Co-Administrators with the will annexed of the estate of Grant H. Piggott, deceased, acting by virtue of the authority of the Wayne County Probate Court, Detroit, Michigan. David S. Piggott resides at Birmingham, Michigan, and Albert F. Piggott resides at Grosse Pointe Park, Michigan. The decedent, Grant H. Piggott, died on July 26, 1957, a resident of Detroit, Wayne County, Michigan. The petitioners timely filed the Federal estate tax return which showed a net taxable estate of $51,483.60. The petitioners and the respondent have agreed that the net taxable estate shown thereon should be increased by $14,512.58. The decedent applied for life insurance to the Home Life Insurance Company on October 31, 1940, and Home Life Insurance Policy No. 480,812, insuring the life of the decedent in an amount of $50,000, was issued to the decedent on November 25, 1940. On the application for insurance, the decedent designated his wife as beneficiary as follows: "Anna Stone Piggott if living otherwise to children equally." The application for insurance included the following question: "Do you reserve the right to change *284 the beneficiary?" The word "Yes" was written in the space provided for the answer. A second application for insurance, dated November 25, 1940, specifically referred to the application dated October 31, 1940. The decedent designated as beneficiary - My wife, Anna Stone Piggott, if she is living at my death, otherwise in equal shares to any children borne to me by my said wife who are then living. This application also included the question: "Do you reserve the right to change the beneficiary?" The word "Yes" was type-written in the space provided for the answer. The policy provides on the face in part: Home Life Insurance Company Incorporated In 1860 In The State of New York Agrees to Pay The Sum of - Fifty Thousand - Dollars less any indebtedness to the Company hereunder, to - Grant H. Piggott - on the third day of November 1976, if then living, or, upon receipt of due proof of the prior death of the Insured, to Anna Stone Piggott, wife of the insured, if she is living at the death of the insured, otherwise in equal shares to any children borne to the insured by his said wife, who are then living. The right of change of beneficiary in accordance with the provisions of *285 the Policy is - reserved to the Insured. If no designated beneficiary survives the Insured the proceeds at the death of the Insured shall be paid to the executors or administrators of the estate of the Insured unless otherwise herein provided. At the time this policy was issued the decedent was 49 years old. The policy further provides in part as follows: Change of Beneficiary If any beneficiary shall die before the insured, the interest of such beneficiary shall vest in the insured unless otherwise herein provided. The insured, subject to any assignment of the policy filed with the Company, may revoke the designation of any beneficiary unless such designation shall have provided otherwise, and may designate a new beneficiary or beneficiaries by filing at the Home Office of the Company a written notice to that effect accompanied by the policy for suitable endorsement. The insured in such notice may declare the designation of any beneficiary to be irrevocable. A change of beneficiary shall take effect upon the endorsement of the same on the policy by the Company. On December 13, 1940, decedent executed and delivered to Home Life a formal revocation of his prior designation *286 of beneficiary and therein designated The J. T. Wing Company, sometimes hereinafter referred to as Wing, as beneficiary. This document contained a clause specifically reserving to him the right under the terms of the policy "to designate a new beneficiary or beneficiaries." The designation of this beneficiary was by its endorsement on the policy in due course given formal recognition by Home Life. The involved policy provided for its dividend participation in the annual surplus of the insurer; that decedent might draw such dividends in cash, have them applied toward payment of premium, used to purchase additional paid-up insurance, or "left with the Company to accumulate at interest," and from time to time to change these options. The usual rights to payment of a ratably increasing cash surrender value upon surrender of the policy and to apply to the insurer for a loan upon the sole security of the policy were also provided. Of the first year's premium, $1,947.50 was paid by the promissory note of decedent. The remaining $250 thereof was paid by Wing. On February 14, 1941, the directors of Wing formally adopted the following resolution: A special meeting of the Directors of J. *287 T. Wing & Company was held at the office of the company on February 14, 1941, at 9:00 O'clock A.M., Pursuant to the call of the president. Present: Grant H. Piggott, David S. Piggott and H. A. Wentworth. Moved by Grant H. Piggott and seconded by H. A. Wentworth that David S. Piggott be elected to the office of Vice-President. Carried unanimously. Moved by Grant H. Piggott and seconded by H. A. Wentworth that the authorized signatures on checks drawn on Manufacturers National Bank, Regular and Special Accounts, be any two of Grant H. Piggott, David S. Piggott and H. A. Wentworth, and that either the President or Treasurer be authorized to sign notes of the company. Carried unanimously. Moved by Grant H. Piggott and seconded by David S. Piggott that premiums on Home Life Insurance Company policy No. 480812 on the life of Grant H. Piggott for $50,000.00, with annual premium of $2,197.50, be paid by J. T. Wing & Company as this company has been endorsed upon the policy as beneficiary. Carried, Affirmative votes being Grant H. Piggott and David S. Piggott, H. A. Wentworth not voting. The purchase of a new Ford truck last August and the trade in of 1936 Ford truck thereon and the *288 purchase of a Chevrolet truck in January and the trade in of G.M.C. truck thereon was unanimously approved. There being no further business, the meeting adjourned. /s/ Grant H. Piggott /s/ H. A. Wentworth President Secretary Thereafter, and until decedent's death, Wing paid all of the premiums upon the policy. The year-end accumulated cash surrender value of the policy was listed on the books of Wing as an asset and in each year the increase thereof was credited against the premiums paid. On November 2, 1949, the policy was pledged by collateral assignment, along with the inventory and accounts receivable of Wing, to The Manufacturers National Bank of Detroit to secure - All liabilities, absolute or contingent, present or future, several or otherwise, of J. T. Wing & Company to said bank, whether it [bank] shall be an original or subsequent party thereto. The duplicate original instrument of assignment delivered to Home Life was attached to the policy in the form of an endorsement. This document was executed by decedent on the line designated for the signature of the insured. Following his signature is the capital letter "P" which we find was to represent the word "President. *289 " The instrument was executed by Wing with the signature of its "Sec'y & Treas" upon the lines designated for the signature of the beneficiary. The policy was delivered to the bank and remained in its possession as security for Wing's loan obligations until the payment of the proceeds thereof following decedent's death. The instrument of assignment specifically reserved to "the insured or others" the right "to change the beneficiary or elect optional methods of settlement" subject, so far as settlement options were concerned, to the prior rights of the bank to payment of any of Wing's outstanding loans from the proceeds of the policy. Upon decedent's death, the proceeds, including post-mortem dividends, were paid by Home Life by two checks, one to the bank in the amount of Wing's loan balance of $9,132 and the remainder to Wing in the amount of $41,171.50. No part of the proceeds was used by Wing to redeem any of decedent's stock therein. At the time the decedent applied for life insurance to Home Life, he was the president of Wing and remained in that capacity until December 31, 1956. The decedent then resigned as president and was elected Chairman of the Board of Directors of Wing, *290 which office he held until his death. At the date of decedent's original application for life insurance and prior thereto, the Reconstruction Finance Corporation was Wing's chief creditor. Its agent had explained to decedent the desirability both from the standpoint of RFC and Wing of Wing's carrying insurance upon decedent's life. In February 1941, the decedent and his family were the largest stockholders of Wing. At the time of his death the decedent owned 343 shares of preferred stock and 541 shares of common stock of Wing and Wing's secretary and treasurer owned 250 shares of its common stock. During the period commencing December 2, 1942, and terminating January 15, 1957, the decedent made total periodic gifts of common and preferred stock of Wing to his sons and daughters-in-law as follows: Common
Preferred
David Piggott
520
50
Albert Piggott
521
50
Elizabeth Piggott
60
50
Anne Piggott
60
50
The decedent completed 2 years of college at Kalamazoo Normal. He was an alert and keen businessman. He devoted a large part of his working time to the selling organization of Wing. In addition, he negotiated the major borrowing for the *291 company. He had guided and managed Wing from a near bankrupt position at the time of his first association therewith to one of moderate success at the time of his death. By December 1952, decedent's two sons, David and Albert Piggott, had become keymen in Wing's operation, and decedent had begun a gradual withdrawal from its direct management. Because of that fact decedent advised that their lives be insured "in the same manner" as decedent's for the protection of the corporation. Home Life, in December 1956, on application of the corporation, issued policies, in the face amount of $50,000 each, upon the lives of the respective sons. By their terms each of these policies specifically and specially provided that Wing was the owner and entitled alone to exercise all of the incidents of ownership therein. Ultimate Finding At the date of his death decedent possessed all of the incidents of ownership appertaining to Home Life Insurance Company Policy No. 480,812 within the meaning of section 2042(2) of theinternal Revenue Code of 1954. Opinion No controversy exists here with respect to the fact that, solely on the basis of the documentary evidence contained in the record, our *292 ultimate finding is correct. The dispute is occasioned by differing views of the parties as to decedent's underlying purpose in acquiring Home Life Policy No. 480,812 and the effect of his designation of Wing as the corporate beneficiary thereof. Both agree that decision may turn upon a question of decedent's intent. Petitioners urge that the documentary form of these transactions does not reflect that intention while respondent contends that it does conform exactly therewith. We have before us, therefore, a clear question of fact with the burden of proof being upon petitioners. It is recognized that this burden is one of extreme difficulty in view of the absence of decedent as a witness herein. Whether the proceeds of the involved policy of life insurance are properly to be included in decedent's taxable estate is, controlled by section 2042(2) of the 1954 Code. [1] The wording of this section clearly evidences a congressional intention to include in the decedent's taxable estate the value (with an exception not herein at issue) of a mere possibility that the proceeds of a policy, such as the one before us, "may return to the decedent or his estate, or may be subject to a power of *293 disposition by him." The retention by decedent here of the power to change an existing beneficiary would constitute such a possibility. We do not think the fact of such a possibility can be gainsaid merely by proof of decedent's intention to divest himself of that power at the time of his designation of Wing as beneficiary. Assuming such an intent, it is difficult to conclude that, in view of his control of the corporation, that entity, regardless of any possible right it might have, would have taken any action to prevent decedent's exercise of this power even to its detriment. It might be argued that the secretary and treasurer of Wing or a creditor thereof could have successfully maintained preventative action in equity with respect to such an attempt by decedent, but this record does not disclose any basis for a conclusion that such an action was likely to have occurred. Nothing appears herein which indicates that Wing, upon decedent's death or prior thereto, would not be able to repay its borrowed funds as they became due or to pay its current obligations. It is true that its chief creditor, the Reconstruction Finance Corporation, had advised and preferred that decedent's life *294 be insured for the benefit and continued well-being of Wing subsequent to decedent's death, but this is not sufficient to indicate a probability that RFC would have instituted action to maintain the corporation as beneficiary. It might well be that the corporation during decedent's life might repay its borrowed funds and have no use for more in which event, with decedent in control, there would be a strong "possibility" that the proceeds of the policy would be paid to his estate or his heirs through a change in his designation of beneficiary. The broad language of the statute requires us to conjecture with respect to the probability of a preventative action by Wentworth. In the 17 years of decedent's life following the issuance of the involved policy many changes could have occurred in the relationship of the stockholders to each other and to Wing. For instance, decedent might have acquired Wentworth's stock and in fact all of the outstanding stock of the corporation. In this event another possibility arises that the insurance proceeds would revert to decedent or his designee other than Wing and this regardless of any original intent on his part to place the incidents of ownership *295 in Wing. The difficulty with petitioners' position is that decedent actually did not place any of the incidents of ownership in Wing. *296 The facts before us, with one exception, are equally consistent with the position of either party hereto. That exception directs decision for respondent. Petitioners' case depends upon the preliminary proposition that decedent was not aware of the legal effect of his designation of Wing as beneficiary. In view of his educational back-ground and his evident skill and experience as a businessman, we are not convinced of his lack of such awareness. In this respect the facts are distinguishable from the facts in , and see . In the former case, the Court of Claims relied on clear evidence that while the application for insurance, contrary to the intention of the insured, indicated that the insured was to own the incidents of ownership, it was in fact her real intention that her son be the owner. We have no such clear proof here. There is no showing here that the designation of Wing as mere beneficiary was a mistake on the part of the insurance agent or decedent. Indeed, the document (Exhibit 4-D) is so clear, uncluttered, and explicit as to afford *297 little room for even conjecture that an experienced, skillful businessman such as decedent is shown to have been would not have known the nature thereof and particularly that its terms reserved the right in him to further change are beneficiary. The two policies on the lives of accedent's some also lend to know by their form and content that decedent intended to retain the incidents of ownership in the policy insuring his life. The record indicates that it was the intention and purpose of decedent and his sons that the policies upon the sons' lives should be the same as that upon his own; that they should, in the same manner, be obtained for the benefit of Wing. Yet contrary to the terms of the policy insuring decedent, they clearly evidence the intention that Wing was their owner. It would be reasonable to conclude in view of this that decedent's policy was examined prior to the issuance of those upon the lives of the sons. From this premise it would be expected that, had decedent considered and intended Wing to be the real owner of the policy on his life, its terms would at that time have been altered to conform to that intention. This was not done. The statutory "possibility that *298 * * * the proceeds of the policy may return to decedent or his estate, or may be subject to a power of disposition by him" remained and continued to the date of his death. We do not consider that since the advent of the 1954 , has any application here. However, the case is distinguishable in any event because in Doerken it was found as a fact that the incidents of ownership were nominal only and impossible of exercise by the insured. Here the possibility of their exercise by decedent is apparent. Petitioners have not sustained their burden of proof. Decision will be entered for the respondent. Footnotes
1. SEC. 2042. PROCEEDS OF LIFE INSURANCE. The value of the gross estate shall include the value of all property - * * *
(2) Receivable by Other Beneficiaries. - To the extent of the amount receivable by all other beneficiaries as insurance under policies on the life of the decedent with respect to which the decedent possessed at his death any of the incidents of ownership, exercisable either alone or in conjunction with any other person. For purposes of the preceding sentence, the term "incident of ownership" includes a reversionary interest (whether arising by the express terms of the policy or other instrument or by operation of law) only if the value of such reversionary interest exceeded 5 percent of the value of the policy immediately before the death of the decedent. As used in this paragraph, the term "reversionary interest" includes a possibility that the policy, or the proceeds of the policy, may return to the decedent or his estate, or may be subject to a power of disposition by him. The value of a reversionary interest at any time shall be determined (without regard to the fact of the decedent's death) by usual methods of valuation, including the use of tables of mortality and actuarial principles, pursuant to regulations prescribed by the Secretary or his delegate. In determining the value of a possibility that the policy or proceeds thereof may be subject to a power of disposition by the decedent, such possibility shall be valued as if it were a possibility that such policy or proceeds may return to the decedent or his estate.↩